FILED: APRIL 25, 2008
08CV2380 EDA
JUDGE LEFKOW
MAGISTRATE JUDGE ASHMAN

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PROMETHEUS LABORATORIES INC., | ) | |
| | ) | Case No.:_____ |
| Plaintiff, | ) | |
| | ) | JUDGE:_____ |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| PERSONAL CARE INSURANCE OF | ) | |
| ILLINOIS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff Prometheus Laboratories Inc. ("Prometheus"), by and through its attorneys,

alleges the following as and for its Complaint against PersonalCare Insurance of Illinois, Inc.

("PersonalCare"):

## NATURE OF ACTION

1.      Prometheus, a specialty pharmaceutical company primarily focused on the

treatment, diagnosis and detection of gastrointestinal, autoimmune and inflammatory diseases

and disorders, brings this action against PersonalCare.

2.      This Complaint concerns wrongful conduct by PersonalCare involving false,

misleading, defamatory and unlawful statements, representations and/or accusations regarding

Prometheus that were made by or attributable to PersonalCare.  Such statements were made to

damage Prometheus by inducing persons and entities with whom Prometheus does business not

to use Prometheus' products or services.

3.      To that end, PersonalCare has attempted to damage Prometheus by, among other

things, publishing false, misleading and defamatory statements about Prometheus to its

customers.

4.     PersonalCare's conduct has already caused, and, if left unchecked, will continue to cause significant and irreparable harm to Prometheus and its business.  Accordingly, Prometheus brings this action to stop PersonalCare's false, misleading, defamatory and unlawful conduct.

## PARTIES

5.     Prometheus is a California corporation with its principal place of business in San Diego, California.

6.     On information and belief, PersonalCare is an Illinois corporation with its principal place of business in Champaign, Illinois.

## JURISDICTION AND VENUE

7.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest or costs, and is between Prometheus, which is a citizen of California, and PersonalCare, which is a citizen of Illinois.

8.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391, because, on information and belief, PersonalCare regularly conducts business in the Northern District of Illinois, such that it is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.     Prometheus is a specialty pharmaceutical company committed to improving the lives of patients.  Prometheus' business primarily focuses on the treatment, diagnosis and detection of gastrointestinal, autoimmune and inflammatory diseases and disorders.  Prometheus markets and delivers pharmaceutical products and also markets and performs diagnostic testing services.

10.     PersonalCare is a corporation that administers various healthcare benefit programs.  PersonalCare contracts with medical service providers in connection with the administration of its healthcare benefit programs.

11.     In early 2006, Prometheus learned that PersonalCare was interested in contracting for Prometheus' services after Prometheus received a packet of information from PersonalCare. The packet of information included a proposed agreement along with corporate information concerning PersonalCare.

12.     During the spring and summer of 2006, after Prometheus decided to explore the possibility of entering into a formal relationship with PersonalCare, Prometheus and PersonalCare negotiated the terms of a potential agreement between PersonalCare and Prometheus.

13.     The negotiations concerned Prometheus' participation in PersonalCare's network of healthcare providers and included discussions about, among other things, the length of a potential agreement as well as the fees Prometheus would charge for its services.  Prometheus understood that any agreement between Prometheus and PersonalCare would include a "fee schedule" that provided PersonalCare with a discount off of Prometheus' standard list rates.

14.     In September and October 2006, representatives from PersonalCare and Prometheus signed an agreement regarding Prometheus' participation in PersonalCare's network of healthcare providers ("Proposed Agreement").  A true and correct copy of the Proposed Agreement is attached hereto as Exhibit A.

15.     The Proposed Agreement defined the effective date as November 1, 2006 ("Effective Date").  *See* Exhibit A.

3

16.     After the Proposed Agreement was signed, but prior to the Effective Date, Prometheus discovered a mistake in certain material terms of the Proposed Agreement. Despite exercising reasonable care in the negotiation of the Proposed Agreement, Prometheus discovered that the terms of the Proposed Agreement included a fee schedule that allowed PersonalCare to pay the lesser of a percentage discount off Prometheus' charges or a percentage discount off the current Medicare RBRVS fee schedule for services included in that schedule. *See* Exhibit A.

17.     During the negotiation of the Proposed Agreement, the parties never discussed, and Prometheus never intended to provide, a discount to PersonalCare that was based off of the Medicare RBRVS fee schedule. Such a discount would have exceeded substantially the largest discount Prometheus ever provided to a healthcare organization and under Prometheus' internal compliance policies, would have required prior approval of Prometheus' Chief Executive Officer. Because no such discount off Medicare fees was contemplated or negotiated, the fee schedule included in the Proposed Agreement contained different pricing terms than those to which the parties had agreed during their negotiations.

18.     On information and belief, PersonalCare knew or should have known that Prometheus did not intend to provide a discount to PersonalCare that was based off of the Medicare RBRVS fee schedule.

19.     After discovery of the mistake in material terms of the Proposed Agreement, on October 31, 2006, prior to the Effective Date of the Proposed Agreement, Prometheus notified PersonalCare that it was cancelling the Proposed Agreement and that the Proposed Agreement was null and void ("October 31, 2006 Notice"). A true and correct copy of the October 31, 2006 Notice is attached hereto as Exhibit B. On or about October 31, 2006, Prometheus also informed PersonalCare that if PersonalCare was still interested in reaching a formal agreement with

4

Prometheus, Prometheus would be willing to consider negotiating the terms of an alternative agreement that contained a significant discount off of its standard list rates.

20.     Following the October 31, 2006 Notice, Prometheus repeatedly followed up with PersonalCare, but PersonalCare did not respond to Prometheus.  Thus, Prometheus' efforts to negotiate the terms of an agreement after the October 31, 2006 Notice were unsuccessful.

21.     In late 2006 and 2007, several members covered by PersonalCare's healthcare plans utilized Prometheus' services.  PersonalCare paid only a fraction of the cost of the services Prometheus provided.

22.     Accordingly, as Prometheus had previously cancelled the Proposed Agreement with PersonalCare, Prometheus billed the patients to whom it had provided its services for the remaining balance that PersonalCare refused to pay.

23.     In September 2007, and again in January 2008, PersonalCare demanded that Prometheus stop billing the patients covered by its health plans for the balance Prometheus was owed.  PersonalCare further claimed that Prometheus was violating the Proposed Agreement.

24.     After PersonalCare demanded that Prometheus stop billing patients for the balance Prometheus was owed, Prometheus and PersonalCare discussed the possibility of negotiating the terms of an agreement between PersonalCare and Prometheus.  During these negotiations, Prometheus offered PersonalCare a much larger discount than Prometheus normally would offer to a customer of PersonalCare's size.

25.     On  or about March 21, 2008, PersonalCare began contacting one or more of Prometheus' customers, urging them to, among other things, stop doing business with Prometheus ("March 21, 2008 Letter").  A true and correct copy of the March 21, 2008 Letter is attached hereto as Exhibit C.

26.    In its March 21, 2008 Letter, PersonalCare stated that Prometheus refused to comply with the terms of the Proposed Agreement and that Prometheus has engaged in "illegal practices" and practices that are "prohibited under the terms of [the Proposed Agreement] and by Illinois law." *See* Exhibit C.  PersonalCare further indicated that it had filed a complaint with the State of California Department of Managed Health Care urging them to "get [Prometheus] to halt these illegal practices." *See id.*

27.    PersonalCare's statements to Prometheus' customers were false, misleading and defamatory at the time they were made.

28.    On April 18, 2008, Prometheus sent PersonalCare a letter demanding that PersonalCare immediately cease and desist from further false communications with Prometheus' customers and/or clients and that PersonalCare immediately issue a retraction of its false statements to any and every entity and individual to which it made such statements.

29.    PersonalCare has taken no steps to retract any of the false, misleading and defamatory statements.

## COUNT ONE
## (DEFAMATION)

30.    Prometheus restates and realleges Paragraphs 1-29 as though set forth fully herein.

31.    PersonalCare made materially false, misleading and defamatory statements about Prometheus and its business.

32.    PersonalCare, without privilege or justification, intentionally and willfully published such false, misleading and defamatory statements to third parties, including but not limited to Prometheus' customers, clients, and entities or persons with which Prometheus does business.  PersonalCare falsely and misleadingly stated that Prometheus refused to comply with

the terms of the Proposed Agreement and that Prometheus has engaged in "illegal practices" and

practices that are "prohibited under the terms of [the Proposed Agreement] and by Illinois law."

*See* Exhibit C. PersonalCare further falsely and misleadingly stated that it had filed a complaint

with the State of California Department of Managed Health Care urging them to "get

[Prometheus] to halt these illegal practices." *See id.*

33.    PersonalCare made these false, misleading and defamatory statements concerning

Prometheus maliciously and with the knowledge that they were false and misleading at the time

they were made or with reckless disregard to the truth of such statements.

34.    Prometheus has suffered damages, and will continue to suffer damages and be

irreparably harmed as a result of PersonalCare's false, misleading and defamatory statements.

## COUNT TWO
## (DECLARATORY JUDGMENT)

35.    Prometheus restates and realleges Paragraphs 1-34 as though set forth fully

herein.

36.    There is a real and actual controversy between Prometheus and PersonalCare

regarding whether there is a valid and enforceable contract between Prometheus and

PersonalCare.

37.    Pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, Prometheus

seeks a declaratory judgment for the purpose of determining and adjudicating questions of actual

controversy between the parties.

38.    Prometheus contends, as it relates to PersonalCare and the Proposed Agreement,

that the Proposed Agreement never constituted a valid and enforceable contract. In the

alternative, in the event the Court determines the Proposed Agreement constituted a valid and

enforceable contract, Prometheus contends that the October 31, 2006 Notice effectively rescinded the Proposed Agreement.

39.    On information and belief, PersonalCare alleges the contrary to Paragraph 38.

40.    Wherefore, Prometheus requests that the Court determine and adjudge that the Proposed Agreement never constituted a valid and enforceable contract. In the alternative, in the event the Court determines the Proposed Agreement constituted a valid and enforceable contract, Prometheus requests that the Court determine and adjudge that the October 31, 2006 Notice, effectively rescinded the Proposed Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Prometheus prays for the following relief:

A.    Injunctive relief against PersonalCare, its agents, attorneys, representatives and those acting in concert with PersonalCare, prohibiting them from making any additional false, misleading or defamatory statements about Prometheus;

B.    Actual, consequential and incidental damages as are fair and reasonable in an amount to be proved at trial;

C.    A declaratory judgment that the Proposed Agreement does not constitute a valid and enforceable contract between Prometheus and PersonalCare; or, in the alternative,

D.    A declaratory judgment that the October 31, 2006 Notice effectively rescinded the Proposed Agreement between Prometheus and PersonalCare;

E.    Punitive damages as are fair and reasonable for PersonalCare's wrongful and willful conduct;

F.    Attorneys' fees and costs incurred by Prometheus in prosecuting this action;

G.    Interest at the legal rate; and

H.     For such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Prometheus hereby demands a trial by jury on all issues so triable, pursuant to Federal

Rule of Civil Procedure 38.

Dated: April 25, 2008                          Respectfully submitted,


                                                _s/_     Zachary T. Fardon_____.
                                               One of the Attorneys for Prometheus Laboratories
                                               Inc.

Zachary T. Fardon
Joel S. Neckers
Jason R. Brost
Latham & Watkins LLP
233 S. Wacker Dr.
Suite 5800
Chicago, IL 60606
Ph: (312) 876-7700
Fax: (312) 993-9767

## <u>Index of Exhibits</u>

Exhibit A:     Proposed Agreement

Exhibit B:     October 31, 2006 Notice

Exhibit C:     March 21, 2008 Letter

# Exhibit A

## PARTICIPATING ANCILLARY PROVIDER AGREEMENT

THIS PARTICIPATING PROVIDER AGREEMENT ("**Agreement**") is made as of the _1st_ of _November_ _2006_ ("**Effective Date**") by and among Prometheus Laboratories Inc., an individual, professional, company, corporation or professional corporation ("**Provider**"), and PersonalCare Insurance of Illinois, Inc. ("**PersonalCare**") and Coventry Health and Life Insurance Company ("**CHC**") (PersonalCare and CHC are collectively referred to herein as "**Health Plan**").

WHEREAS, Health Plan makes available to employers and individuals, or administers on behalf of employers or other entities, various health care benefit programs for the benefit of employees and their eligible dependents or individual participants and their eligible dependents, including, a PersonalCare product and such other products listed in Exhibit A ("**Managed Care Products**"); and

WHEREAS, Provider desires to, and Health Plan desires that Provider, participate in Health Plan's networks of health care providers, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and intending to be legally bound hereby, the parties hereto agree as follows:

### GENERAL TERMS AND CONDITIONS

1.    **DEFINITIONS**

1.1  **Claim.** The completed standard UB-92 or CMS-1500 claim form or its successor as it may be amended from time to time, or such other claim form acceptable to the Health Plan submitted by the Provider for reimbursement of the Provider's provision of health care services. The form shall be accompanied by any records or documentation requested by the Health Plan or the applicable Payor. All claim forms shall include such statistical and descriptive medical and patient data and identifying information as specified by the Health Plan or the applicable Payor. Documentation includes but is not limited to ER face sheets, discharge summaries, progress notes, and operative notes, as appropriate.

1.2  **Clean Claim.** Clean Claim shall have the meaning required by law in the State of Illinois and shall include all information necessary to be submitted in compliance with Sections 1.1, 2.5 and 3.2.4.

1.3  **Covered Services.** All of the health care services and supplies that are Medically Necessary, that Provider is licensed to provide to Members, and that are covered under the terms of the applicable Member Contract.

1.4  **Emergency Services.** Any health care service provided to a Member after the sudden onset of a medical condition that manifests itself by acute symptoms of sufficient severity (including but not limited to, severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in: (i) placing the health of the Member, or, with respect to a pregnant Member, the health of the Member or her unborn child, in serious jeopardy; (ii) serious impairment to bodily functions; or (iii) serious dysfunction of any bodily organ or part.

1.5  **Medically Necessary.** Unless otherwise defined in the Member Contract in which case the definition therein shall control, Medically Necessary shall mean those services, supplies, equipment and facilities charges that are not expressly excluded under the Member Contract and determined by Health Plan to be:

   1.5.1  Medically appropriate, which means that the expected health benefits (such as, but not limited to, increased life expectancy, improved functional capacity, prevention of complications, relief of pain) exceed the expected health risks by a sufficiently wide margin;

   1.5.2  Necessary to meet the basic health needs of the Member as a minimum requirement;

**1.5.3** Rendered in the most cost-efficient manner and setting appropriate for the delivery of the health service;

**1.5.4** Consistent in type, frequency and duration of treatment with scientifically-based guidelines of national medical research, professional medical specialty organizations or governmental agencies that are accepted by the Health Plan;

**1.5.5** Consistent with the diagnosis of the condition;

**1.5.6** Required for reasons other than the comfort or convenience of the Member or Member's physician; and

**1.5.7** Of demonstrated value based on clinical evidence reported by peer reviewed medical literature and by generally recognized academic medical experts; that is, it is not experimental or investigational.

**1.6 Member.** An individual who is eligible to receive Covered Services under a Member Contract. Member includes the subscriber and any of the subscriber's eligible dependents.

**1.7 Member Companies.** Any corporate entity that, directly or indirectly, is a parent, subsidiary or affiliate of PersonalCare Insurance of Illinois, Inc., and Coventry Health Care, Inc.; including, without limitation, Coventry Health and Life Insurance Company, Coventry Healthcare Management Corporation, and Group Health Plan, Inc.

**1.8 Member Contract.** The group or individual Subscription Agreement, Certificate of Insurance, Group Master Agreement, Evidence of Coverage or other contract as amended from time to time between a Payor and an employer, union or Member, which sets forth the terms of the health benefit program and the particular Managed Care Product.

**1.9 Non-Commercial Members.** For purposes of section 3.2, all Members (1) enrolled in the Health Plan through Medicare, Medicaid, CHAMPUS, PEIA, or a Medicare Supplement policy, (2) enrolled in the Health Plan and receiving services under workers' compensation coverage, or (3) where the Health Plan serves as a third party administrator for a self-insured employer group health plan.

**1.10 Participating Provider.** A health care provider, including, but not limited to a physician, hospital, home health agency, skilled nursing facility, laboratory or other professional, facility, supplier, or vendor that has entered into a direct or indirect written agreement with the Health Plan to provide Covered Services to Members.

**1.11 Payor.** An entity authorized by Health Plan to access one or more networks of Participating Providers and who or which is liable for funding or underwriting benefit payments under a Member Contract, which entity has a financial responsibility to pay for Covered Services rendered to Members. Payors include Health Plan, Member Companies, insurers, employers, unions and other entities.

**1.12 Provider Manual.** The published policies and procedures of Health Plan applicable to Participating Providers, as may be amended by Health Plan from time to time.

**2.     PROVIDER OBLIGATIONS**

**2.1 Provision of Covered Services.**

**2.1.1** Provider shall provide to Members, those Covered Services set forth in the Member Contract that are generally provided by Provider and for which Provider has been credentialed

and/or approved by Health Plan. Such Covered Services shall be delivered in a prompt manner, consistent with professional, clinical and ethical standards, and in the same manner as provided to Provider's other patients

**2.1.2** Provider shall not discriminate against a Member on the basis of age, race, color, creed, religion, gender, sexual preference, national origin, health status, use of Covered Services, income level, or on the basis that Member is enrolled in a managed care organization or is a Medicare or Medicaid beneficiary.

**2.1.3** For services rendered by any Covering Provider on behalf of Participating Provider, including Emergency Medical Services, Covering Provider shall bill Health Plan and Health Plan shall reimburse Covering Provider at the applicable contractual rates, agreed to and detailed in Health Plan's contract with Provider. Provider shall ensure that the Covering Provider will not, under any circumstances, bill a Member for Covered Services (except as permitted under Sections 2.8 and 3.1 below), and Provider hereby agrees to indemnify and hold harmless Members and Health Plan against charges for Covered Services rendered by Covering Providers.

**2.1.4** Provider agrees to make medical services available, pursuant to the terms of this Agreement, to participants in other health programs and payors which contract directly or indirectly with Health Plan to provide such medical services for those programs' members within Health Plan's service area.

**2.2    Programs & Procedures.**  Provider agrees to comply with Health Plan's Provider Policy and Procedure Manual, quality improvement, utilization review, peer review, grievance procedures, credentialing and recredentialing procedures and any other policies that the Health Plan may implement, including amendments made thereto from time to time to the extent such policies relate to clinical laboratory requirements.

**2.3    Licensure & Liability Insurance.**  Provider agrees to maintain in good standing all licenses, accreditations, and certifications required by law for so long as this Agreement is in effect. In addition, Provider agrees that all of Provider's personnel, including its employees, will maintain all necessary licenses, accreditations, and certifications. Provider agrees to procure and maintain insurance, by whatever name known, for liability to protect against all allegations arising out of the rendering of professional services or the alleged failure to render professional services by Provider and Provider's employees (**"Liability Insurance"**). Liability Insurance coverage shall be maintained at levels of at least $1,000,000 per occurrence and $3,000,000 aggregate. Provider shall provide Health Plan immediate notice of any change in Provider's insurance coverage or licensure status.

**2.4    Claim Submission.**  Provider shall submit claims and encounter data in the form and manner described herein regardless of the method of reimbursement. Provider shall submit claims for Covered Services directly to Health Plan within sixty (60) days of the date of service. Any claim submitted more than ninety (90) days following the date of service will be denied, unless the claim was returned to Provider for further information. Provider agrees not to submit a duplicate claim for payment within thirty (30) days of Provider's original submission. Unless otherwise directed by Health Plan, Provider shall submit claim or encounter data using the current UB92 Form or Centers for Medicare & Medicaid Services ("CMS") 1500 forms with current CMS coding, current International Classification of Diseases, Ninth Revision ("ICD9") and Current Procedural Terminology Fourth Edition ("CPT4") coding. Provider also shall include with the claim Provider's customary charge for the service rendered to the Member and the Member's identification number, the Provider's federal tax ID number and any other information required by Health Plan.

**2.4.1** Provider specifically acknowledges that Health Plan may reduce or deny payment for services which are not submitted for payment in accordance with the provisions of this Section 2.5 or which are not billed or coded in accordance with generally accepted industry standards for billing and coding practices.

2.6**Access to and Copying Records.**

    2.6.1Copies.  Provider understands and agrees that neither Health Plan nor Members shall be required to reimburse Provider for expenses related to providing copies of patient records or documents to any local, state or federal agency, accreditation agency, or Health Plan: (i) pursuant to a request from any local, state or federal agency (including, without limitation, CMS) or such agencies' subcontractors; (ii) pursuant to administration of Health Plan's Quality Improvement, Utilization Management, and Risk Management Programs; (iii) in order to assist Health Plan in making a determination regarding whether a service is a Covered Service for which payment is due hereunder; or (iv) for any other purpose.

    2.6.2Access.  Except when prohibited under HIPPA or other State and Federal regulations, all records, books, and papers of Provider pertaining to Members, including without limitation, records, books and papers relating to professional and other care provided to Members and financial, accounting and administrative records, books and papers, shall be open for inspection and copying by Health Plan, its designee and/or authorized State or Federal authorities during Provider's normal business hours.

    2.6.3Survival.  The terms and conditions of this Section 2.7 shall survive the termination of this Agreement.

**2.7  Hold Harmless.**

    **2.7.1**  Provider agrees that in no event, including, but not limited to, nonpayment by Health Plan of amounts due under this contract, Health Plan insolvency or breach of this Agreement by Health Plan, shall Provider, its assignees, subcontractors, or its independently contracted professionals, have a right to seek any type of payment from, bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against, the Member, persons acting on the member's behalf other than Health Plan , the employer or group contract holder for services provided pursuant to this Agreement except for the payment of applicable co-payments or deductibles for Covered Services or fees for services not covered by the Health Plan.

    **2.7.2**  This section shall not prohibit collection of co-payments, coinsurance, or deductibles in accordance with the Member Contract.

    **2.7.3**  Provider further agrees that: (i) the requirements of this clause shall survive any termination of this Agreement for services rendered prior to such termination, regardless of the cause giving rise to termination; (ii) the Member, persons acting on the Member's behalf (other than the Health Plan) and the Payor shall be third party beneficiaries of this clause; and (iii) this provision supercedes any oral or written agreement now existing or hereafter entered into between Provider and a Member, a person acting on Member's behalf, and the Payor contract holder.

    **2.8  Duty to Notify Health Plan.**  Provider agrees to immediately notify Health Plan, in writing, of (i) any change in its business address or ownership or management structure; (ii) change in its licensure or accreditation status, action against any of its licenses, accreditation by CAP, or certifications including, but not limited to, those under Titles XVIII or XIX of the Social Security Act; (iii) any judgment or settlements decreed or entered into on behalf of Provider; and (iv) any other situation that my materially interfere with Provider's duties and obligations under this agreement.

    **2.9 Marketing.**  Health Plan shall have the right to use the name, address, telephone number, specialty field and description of services of Provider for purposes of marketing, informing Members of the identity of Provider, and otherwise to carry out the terms of this Agreement.

3.    **HEALTH PLAN OR PAYOR OBLIGATIONS**

**3.1 Payment.** Health Plan, or the applicable Payor, shall pay and Provider agrees to accept as payment in full for all Covered Services rendered to Members, payment as set forth in Exhibit B. Except for applicable co-payments, coinsurance or deductibles, Provider shall look only to Health Plan or a Payor, when it is another Payor's obligation, for compensation for Covered Services provided to Members and will not seek reimbursement from anyone other than Health Plan or Payor. Provider agrees to look only to the applicable Payor for reimbursement when Payor is not Health Plan. Provider understands and agrees that Health Plan shall not be liable for payment for Covered Services rendered to Members if Payor is a self-insured or self-funded employer, union or trust.

**3.2 Prompt Pay.** Upon receipt of a Clean Claim, Health Plan shall make payments to Provider as set forth below. This section is specifically intended to articulate the requirements of 215 ILCS 5/357.9. Where any contradiction exists between the section of this Agreement and Illinois law, the later shall control. Where permitted by applicable law, this section does not apply to Claims for Non-Commercial Members.

**3.2.1** Except as set forth in Sections 3.2.3 and 3.2.4, within thirty (30) days after the receipt by the Health Plan of the submitted Claim(s), the Health Plan shall: (i) make payments for such services provided; (ii) notify Provider in writing of the reason or reasons for nonpayment; or (iii) notify Provider in writing of what additional information or documentation is necessary to complete the Claim for reimbursement, as set forth in Section 3.2.3.

**3.2.2** Within thirty (30) days after receipt of Claim, the Health Plan shall request electronically or in writing from Provider any information or documentation that the Health Plan reasonably believes will be required to process and pay the Claim or to determine if the Claim is a Clean Claim. Upon receipt of the information requested under this Subsection which the Health Plan reasonably believes will be required to adjudicate the Claim or to determine if the Claim is a Clean Claim, the Health Plan shall either pay or deny the claim within thirty (30) days. The Health Plan shall not refuse to pay the Claim if the Health Plan fails to timely notify Provider within thirty (30) days of receipt of the Claim of the additional information requested unless such failure was caused in material part by Provider. Nothing in this section shall preclude the Health Plan from retroactively denying payment of a Claim as permitted in Section 3.2.7.

**3.2.3** For payment to be rendered, Claims must be Clean Claims for Medically Necessary Covered Services: (i) authorized by the Health Plan, except for Emergency Services or as otherwise expressly provided in this Agreement; (ii) provided to an eligible Health Plan Member; (iii) billed according to the arrangement set forth in this Agreement; (iv) supported by appropriate documentation; (v) with no unresolved issues of subrogation or coordination of benefits; (vi) with no evidence of fraud or material misrepresentation; (vii) with no other party or Payor responsibility; (viii) with no dispute regarding the amount of charges submitted; (ix) for which Provider has not already been paid; and (x) submitted within ninety (90) days from the date of service.

**3.2.4** If the Health Plan fails to pay Clean Claims submitted in accordance with Section 3.2 within thirty (30) days, the Health Plan shall pay, in addition to any reimbursement for Covered Services provided, interest on such benefits at the rate of nine percent (9%) per year, which shall accrue beginning thirty one (31) days after the Health Plan's receipt of the Clean Claim meeting the requirements of Section 3.2. The Health Plan shall accompany the payment of such interest with an explanation of the assessment of interest paid within thirty (30) days after the Claim is paid.

**3.2.5** The Health Plan shall maintain written or electronic record of the date of receipt of a Claim. On request, Provider may inspect the record and rely on that record or on any other relevant evidence as proof of receipt of Claim.

**3.2.6** At any time the Health Plan may deny a previously paid Claim in any of the following circumstances: (i) the Claim was submitted fraudulently; or (ii) the Claim contained material misrepresentations. Within one year of the date the Health Plan paid the Claim, the Health Plan may deny a

previously paid Claim in any of the following circumstances: (i) the Claim payment was incorrect because Provider was already paid for the health care services identified on the Claim or the health care services were not delivered by Provider; (ii) Provider was not entitled to reimbursement; (iii) the service provided was not a Covered Service; or (iv) the Health Plan Member was not eligible for reimbursement.

### 3.2.7 Retroactive Denials.

**3.2.7.1** Health Plan shall retain at all times the right to offset against any future payments any amount arising from a retroactively denied Claim. Health Plan shall use reasonable efforts to notify Provider of such action. Upon offset or receipt of notice of retroactive denial, Provider shall notify the Health Plan within forty (40) days of Provider's desire for a written explanation of the reasons for the denial.

**3.2.7.2** Upon receipt of explanation for retroactive denial, Provider may provide written notice of dispute. If Provider does not notify the Health Plan within thirty (30) days of receipt of explanation, of Provider's intent to dispute the denial, then Provider shall be deemed to have accepted and agreed to the retroactive denial and offset.

**3.2.7.3** Disputes shall be resolved between the parties in accordance with Section 5.8. Immediately upon resolution of the dispute, Provider shall pay any amount due. If Provider does not pay the Health Plan immediately upon the resolution of the dispute, then the Health Plan shall have the right to offset the amount against future payments.

**3.3  Coordination of Benefits.** Health Plan and Provider respectively acknowledge that the authority and responsibility for Coordination of Benefits shall be carried out in accordance with the provisions set forth in the Member Contract. Provider agrees to cooperate with Health Plan by taking reasonable steps to determine if another carrier is involved and to notify Health Plan of the existence of such carrier as soon as possible. If Health Plan is the primary payor under the applicable coordination of benefits rules, Health Plan shall pay Provider only the amounts due under this Agreement, provided, however, that if Provider obtains any additional payment from secondary payors under the applicable coordination of benefits rules, Provider shall be entitled to retain any such additional payments. If Health Plan is other than primary payor under the coordination of benefits rules for Members other than for whom Provider has received a capitation payment from Provider Health Plan, Provider shall first bill the primary carrier, and after Provider receives payment, Health Plan shall then pay Provider only those amounts which, when added to the amounts paid to Provider from other sources, equals the amount due to Provider under this Agreement. Provider shall bill Health Plan for these amounts in accordance with the timeframes required under Section 2.5.

**3.4  Identification Cards.** Health Plan shall provide an identification card to Members which shall identify the Member's benefit plan and the telephone number that Provider may call during normal business hours to verify Member eligibility and obtain general information regarding the Member's benefit plan, including any limitations or conditions on Covered Services. At such time as Health Plan receives an inquiry from Provider regarding a Member's benefit plan or Covered Services, Health Plan shall use information given to Health Plan by Provider to make preliminary benefit decisions. Health Plan shall retain the right and sole responsibility to determine whether a service is a Covered Service.

**3.5  Failure To Comply.** Services rendered not in compliance with Health Plan's policies and procedures, including failure to obtain necessary authorizations, may be denied by Health Plan. These services are considered non-reimbursable, and the Member may not be billed pursuant to Sections 2.7 and 3.1 of this Agreement.

**3.6  Recovery Right.** Health Plan shall have the right to recover payments or offset future payments in the event that Health Plan determines that an individual was not an eligible Member at the time of services, in the event of duplicate payment, payment error, or in the event of fraud.

4.    **TERM AND TERMINATION**

**4.1  Term of Agreement.** The Initial Term of the Agreement shall be for two (2) year from the Effective Date set forth above ("Initial Term"). Following the Initial Term, the Agreement will be automatically renewed for one-year periods thereafter unless either party provides written notice ninety (90) days before the Anniversary Date of such Party's intention not to renew or terminated as set forth below.

**4.2  Termination without Cause.** Following the Initial Term, either Party may terminate this Agreement with ninety (90) days prior written notice, which termination shall be effective the last day of the month following the ninety (90) day period.

**4.3  Termination with Cause.**

**4.3.1**  Breach.  Either Party may terminate this Agreement for the breach of a material term, condition or provision of this Agreement, after thirty (30) days prior written notice to the other Party, specifying such material breach.  The breaching Party shall have a minimum of thirty (30) days or such longer reasonable period as agreed to by the Parties to correct or cure such material breach.  If the breaching Party fails or refuses to cure the material breach within such time, then the non-breaching Party may elect to terminate this Agreement effective the last day of the month following the end of the notice period.  The remedy herein provided shall not be exclusive of, but shall be in addition to, any remedy available at law or in equity to the non-breaching Party.

**4.4  Immediate Termination by Health Plan.**  Health Plan may immediately terminate Provider from providing Covered Services to Members, and the Provider shall immediately cease providing Covered Services, for the following reasons:

**4.4.1**  Termination, revocation, suspension or other limitation of Provider's license or certification;

**4.4.2**  Conviction of, or plea of no contest to, a felony or any criminal charge related to the medical, financial and other practices of Provider;

**4.4.3**  Provider's suspension or termination from participation in Medicare or Medicaid; or

**4.4.4**  Health Plan determines in good faith that the Provider's continued provision of services to Members may result in, or is resulting in, danger to the health, safety or welfare of Members.

**4.4.5**  Health Plan determines in good faith that, after notice to Provider and opportunity to cure, the Provider has not materially complied with the provisions of the Health Plan's Provider Manual or other applicable policies and procedures and is unwilling or unable to work cooperatively in a managed care environment.

**4.5  Immediate Termination by Provider.** The Provider may terminate this Agreement due to Health Plan's loss of Certificate of Authority to perform business as a licensed managed care organization; provided Provider shall be subject to any medical practice standards regarding abandonment of patients.

5.    **GENERAL REQUIREMENTS**

**5.1  Assignment.**  This Agreement, being intended to secure the services of and be personal to the Provider, shall not be assigned or transferred by Provider without the prior written consent of Health Plan.  Nothing herein shall prohibit Health Plan's assignment of this Agreement to a Member Company or delegation of any administrative obligations hereunder to another entity, including, but not limited to, Payor or its designee.

**5.2  Amendments.**

**5.2.1**  Health Plan may amend this Agreement to the extent necessary to comply with applicable Federal or State law, regulatory requirements, accreditation standards or licensing guidelines or rules.  Health Plan shall give advance written notice to the Provider of such amendment and the effective date of the amendment.  Any amendment by Health Plan pursuant to this Section 5.2.1 will be deemed accepted unless Provider objects, in writing, to the terms and provisions of the amendment within twenty (20) business days of receiving the amendment.  If Provider objects to the terms and provisions of the amendment this Agreement may be immediately terminated by Health Plan.

**5.2.2**  Health Plan may also amend or modify any provision of this Agreement by notifying Provider, in writing, at least thirty (30) days prior to the effective date of said amendment or modification.  Provider shall be deemed to have accepted Health Plan's amendment if Provider fails to object to such amendment, in writing, within thirty (30) days of the date Provider receives Health Plan's notice of the proposed amendment. If an amendment is not acceptable to the Provider, this Agreement may be terminated by Provider as detailed in Section 4.  In the event that Provider notifies Health Plan of its intention not to accept said amendment, Health Plan may at its express discretion immediately terminate this Agreement. No other modifications, discharges, amendments or alterations shall be effective unless evidenced by an instrument in writing and signed by both Provider and Health Plan, except as such changes may be required by and become effective according to Section 5.2.1 above.

**5.3  Confidentiality.**  Provider and Health Plan agree to maintain the privacy and confidentiality of all information and records regarding Members, including but not limited to medical records, in accordance with all State and Federal laws, specifically including all regulations promulgated under The Health Insurance Portability and Accountability Act of 1996 (HIPAA).  In addition, each Party shall maintain the confidentiality of the financial terms of this Agreement and the confidentiality other Party's proprietary information that is not otherwise public information including the terms of reimbursement, provided Health Plan may disclose reimbursement terms to prospective and current employer groups. This paragraph shall survive the termination of the Agreement.

**5.4  Names, Symbols, Trademarks.**  Except as provided in Section 2.12, Health Plan and Provider each reserve the right to and control of the use of their name, symbols, trademarks, and service marks presently existing or later established.  In addition, except as provided in Section 2.12, neither Health Plan nor Provider shall use the other Party's name, symbols, trademarks, or service marks in advertising or promotional materials or otherwise, without the prior written consent of that Party and shall cease any such usage immediately upon written notice of the Party or on termination of this Agreement, whichever is sooner.  Further, Provider agrees than any Health Plan identification at Provider's site of service shall be at least equal in prominence to the identification of any other plan or payor.

**5.5  Access to Records and Audit.**  Exept as limited or prohibited under HIPPA or other State and Federal regulations,Provider shall provide Health Plan with access to such medical, financial, and administrative information as may be necessary for compliance by Health Plan with State and Federal laws and regulations, as well as for program management and accreditation agency purposes.  Provider further agrees to authorize State and Federal agencies such access to medical records of Members as is needed to assess the quality of care rendered to such Members or for other State and Federal purposes.  In addition, Provider shall allow Health Plan to audit Provider's records for payment and claims review purposes. This paragraph shall survive the termination of this Agreement.

**5.6  No Solicitation of Members**.  So long as the Agreement is in effect, and for a period of one (1) year from the date of termination, Provider agrees that Provider will not, within the service area of Health Plan: (i) advise or counsel any employer, Payor, Participating Provider, or Member to disenroll from Health Plan; (ii) solicit any employer, Payor, or Member to become enrolled with any other managed care organization, any other hospitalization or medical payment plan, or insurance carrier; and (iii) otherwise interfere with Health Plan's relationship with Members or with any of the foregoing entities.  Health Plan shall notify Members in the event that Provider is no longer a Participating Provider.  Health Plan shall notify Members upon receipt of notice of termination or as required by law, regulation, and/or NCQA guidelines.  Health Plan shall be solely responsible for such notification.  Nothing in this Agreement shall be construed to prohibit Provider from freely communicating with patients regarding: (i) medically necessary and appropriate care with or on behalf of a Member; (ii) the process that Health Plan or any entity contracting with Health Plan uses or proposes to use to deny payment for a health care service; and (iii) the decision of any managed care plan to deny payment for a health care service.  In the event that either party violates its duties under this provision, the other party may seek injunctive relief.  This Section shall survive the termination of this Agreement.

**5.7  Dispute Resolution and Arbitration.**

> **5.7.1  Provider Dispute Resolution**.  Except for disputes, claims, questions, or differences related to medical malpractice, terminations of an individual provider's participation pursuant to Health Plan's Credentialing Policies and Procedures, termination without cause, or as otherwise provided herein, if any dispute arises out of or relates to this Agreement, Provider shall follow the Provider Appeal procedure(s) described in the Provider Manual or other Health Plan policies and procedures.  In the event that the process outlined in the Provider Manual or other policies and procedures, fails to resolve the dispute, or the matter is of a nature not addressed in said materials, the aggrieved party shall notify ("**Notice #1**") the other, in writing, of the dispute, claim, question, or difference.  Both parties shall meet and negotiate, in good faith, to attempt to reach a solution satisfactory to both parties within sixty (60) days of receipt of Notice #1.  If efforts are unsuccessful, then upon further notice ("**Notice #2**") by either party to the other, all said disputes, claims, questions, or differences shall be submitted to mediation.

> **5.7.2  Mediation**.  All mediation proceedings shall be administered through the American Arbitration Association ("**AAA**") under its Commercial Mediation Rules.  In the event that the mediation process fails to resolve the dispute, claim, question, or difference within sixty (60) days of the receipt of Notice #2 then all said disputes, claims, questions, or differences may be submitted to binding arbitration for resolution upon election of and notice ("**Notice 3**") by either party.

> **5.7.3  Arbitration**.  Any unresolved disputes, claims, questions, or differences arising from or relating to this Agreement or breach thereof, which remain unsettled after attempts at negotiation and mediation, shall, upon election, be settled by arbitration administered by the AAA.  The dispute shall be settled strictly in accordance with this Agreement and the substantive laws of the State of Illinois, unless such state laws are otherwise preempted by Federal law, or as otherwise provided herein.  The rules of the arbitration shall be the Commercial Arbitration Rules of the AAA using a three-member panel of arbitrators.  Within fifteen (15) days after receipt of the notice of arbitration, each party shall select a person to act as arbitrator and the two selected shall select a third arbitrator within ten (10) days of their appointment.  If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the AAA.  The decision(s) of the arbitrators shall be final and binding.  Judgment upon the award rendered by the arbitrators may be entered and enforced in any court of competent jurisdiction.

**5.7.4  Location**.  The place of mediation and, if necessary, arbitration shall be San Diego, California.

**5.7.5  Costs**.  In the event that either party institutes any mediation, arbitration, suit or proceeding to enforce or interpret the provisions of this Agreement, each party shall be responsible for its own costs and expenses, including but not limited to attorney's fees.  Each party shall be responsible for an equal share of the mediators', arbitrators', and/or administrative fees of mediation and/or arbitration associated with such an action.

**5.7.6  Relief**.  The parties further agree that in no event shall the mediators or arbitrators have authority to award punitive or other damages not measured by the prevailing party's actual damages, unless specifically required by statute.  Notwithstanding the foregoing, no party shall be precluded from seeking injunction or other equitable relief in court in connection with those sections of this Agreement that specifically permit actions for said relief.

**5.7.7  Confidentiality**.  Except as may be required by law, neither party nor a mediator or arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both Provider and Health Plan.

**5.7.8  Survival of Section**.  This Section shall survive termination of this Agreement.

**5.8  Third Party Beneficiaries**.  Other than the Parties expressly set forth in the Agreement, no third persons or entities are intended to be or are third party beneficiaries of or under the Agreement, including, without limitation, Members.  Nothing in the Agreement shall be construed to create any liability on the part of Health Plan, Provider or their respective directors, officers, shareholders, employees or agents, as the case may be, to any such third parties for any act or failure to act of any party hereto.

**5.9  Notice**.  Any notice, request, demand or communication required or permitted hereunder (**"Notices"**), shall be given in writing by certified mail, return receipt requested, or courier service with proof or receipt, to the party to be notified.  All Notices shall be mailed or delivered to the addresses as follows:

**Health Plan**

PersonalCare Insurance of Illinois, Inc.
2110 Fox Drive
Champaign, IL  61820
Attn: Network Development

**Provider**

Address as on Signature Page.
Attention: Legal Department

**5.10  Relationship.**  None of the provisions of this Agreement is intended to create, or shall be deemed or construed to create any relationship between the parties hereto other than that of independent entities contracting with each other hereunder solely for the purpose of effecting the provisions of this Agreement.  Neither Provider nor Health Plan shall be liable to any other Party for any act, or any failure to act, of the other Party to this Agreement.  This Agreement shall not be interpreted so as to find the Member Companies jointly and severally liable hereunder.  The parties agree that this Agreement shall be interpreted to be between Provider and whichever of the Member Companies is a party to the Member Contract under which the Member related to the then instant matter is receiving Covered Services.

**5.11    Representation by Counsel.** Each Party acknowledges that it has had the opportunity to be represented by counsel of his/her/its choice with respect to this Agreement. In view of the foregoing and notwithstanding any otherwise applicable principles of construction or interpretation, this Agreement shall be deemed to have been drafted jointly by the parties and in the event of any ambiguity, shall not be construed or interpreted against the drafting party.

**5.12    Waiver.** The waiver by either party of any breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach of the same or other provision.

**5.13    Severability.** In the event any portion of this Agreement is found to be void, illegal, or unenforceable, the validity or enforceability of any other portion shall not be affected.

**5.14    Entire Agreement.** This Agreement, together with Exhibits, Attachments and Health Plan's policies and Provider Manual, constitute the entire understanding of the parties with respect to the subject matter and supercedes any prior agreements.

IN WITNESS WHEREOF, the authorized representatives of the parties have duly executed this Agreement as set forth below.

*The undersigned Provider certifies that s/he has not changed or modified any portion of this Agreement.*

**Provider**

By: *[signature]*

Print Name: Ron Rocca

Tax ID#: _____

Date: 9/19/06

Address for Notice: Attention: Legal Department

9410 Carroll Park Drive

San Diego, CA 92121

Telephone Number: (858) 824-0895

Fax Number: (858) 824-0896

**PersonalCare Insurance of Illinois, Inc. .**

By: *[signature]*

Print Name: Paul T. Eisenstat

Title: Vice President, Network Development

Date: 10-2-06

*[handwritten note in left margin: due upon 9/19/06]*

**EXHIBIT A**

**Managed Care Products**

Health Plan may designate Provider as a participating provider in one or more of its Managed Care Products based upon the following designs:

1. HMO – Health benefit plan that provides health care services in a specific geographic area, through Participating Providers, for an agreed upon set of basic and supplemental health maintenance and treatment services to Members.

2. POS – Same as HMO above except that Members may receive care from both Participating Providers and non-Participating Providers.

3  PPO – Members may receive care from both Participating Providers and non-Participating Providers with financial incentives to encourage utilization of Participating Providers.

4. Workers' Compensation – Members may receive services from both Participating Providers and non-Participating Providers for compensable injuries or diseases arising in the course of employment.

5. Self- funded Payor Products administered by Health Plan and Member Companies.

6. Self-funded Payor Products administered by Payors other than Health Plan and Member Companies.

**EXHIBIT B**
Compensation
All Products

I.    **REIMBURSEMENT RATE FOR ALL PROGRAMS UNDERWRITTEN OR ADMINISTERED BY HEALTH PLAN & MEMBER COMPANIES.**

A.    Health Plan or the applicable Payor shall pay Provider the following rates for Covered Services rendered to Members enrolled through all programs underwritten or administered by Health Plan as described in Exhibit A Sections 1-5. Health Plan shall use the current Medicare RBRVS fee schedule, geographically-adjusted for Medicare locality 0095299, and will use the current Complete St. Anthony's RBRVS geographically adjusted fee schedule, or its successor, as a gap fee schedule if Medicare's fee schedule does not contain a relative value unit. In the event neither CMS nor St. Anthony's has a published RVU, Health Plan will pay Provider 70% of billed charges.

1). Laboratory Services. For Covered Services rendered to Members Health Plan shall pay Provider eighty percent (80%) of the current Medicare RBRVS fee schedule, or seventy percent (70%) of billed charges whichever is lower, less any copayments, deductibles, or coinsurance amounts. For Covered Services for which there is no fee in the current Medicare RBRVS fee schedule, Health Plan shall pay Provider seventy percent (70%) of Providers billed charges, less any copayments, deductibles, or coinsurance amounts.

II.    **REIMBURSEMENT RATE FOR ALL NETWORK RENTAL PAYORS.**

A. Health Plan or the applicable Payor shall pay Provider the following rates for Covered Services rendered to Members enrolled through all programs underwritten or administered by Health Plan as described in Exhibit A Section 6. Health Plan shall use the current Medicare RBRVS fee schedule, geographically-adjusted for Medicare locality 0095299, and will use the current Complete St. Anthony's RBRVS geographically adjusted fee schedule, or its successor, as a gap fee schedule if Medicare's fee schedule does not contain a relative value unit. In the event neither CMS nor St. Anthony's has a published RVU, Health Plan will pay Provider 70% of billed charges.

1). Laboratory Services. For Covered Services rendered to Members Health Plan shall pay Provider eighty eight percent (88%) of the current Medicare RBRVS fee schedule, or seventy percent (70%) of billed charges whichever is lower, less any copayments, deductibles, or coinsurance amounts. For Covered Services for which there is no fee in the current Medicare RBRVS fee schedule, Health Plan shall pay Provider seventy percent (70%) of Providers billed charges, less any copayments, deductibles, or coinsurance amounts.

III.    **COMPENSATION PER CLAIM**

The compensation per claim, for Covered Services, payable by Health Plan and/or Payor, as appropriate, to Provider, subject to the terms of this Agreement, the applicable Group Membership Agreement and corresponding coordination of benefit terms, shall be equal to:

A.    The lesser of:

1. The Reimbursement Rate specified in this Exhibit B; or

2. Ninety percent (90%) of Provider's billed charges; or

3. For Managed Care Products and programs described in Exhibit A, Section 4, reimbursement under this Agreement shall not exceed ninety percent (90%) of the amount allowed for Provider's services under Workers' Compensation laws and regulations.

B.      Minus any applicable copayments, coinsurance and/or deductible amounts

Provider agrees that it will not bill Members for amounts in excess of the copayments, coinsurance or deductible provided for in Member's Group Membership Agreement, except as provided in this Agreement.

# Exhibit B



**PROMETHEUS™**
Therapeutics & Diagnostics
*For the person in every patient*

October 31, 2006

VIA:  Fax: Rockford:    815-721-2120
            Champaign:  217-366-5410
       And, Federal Express

**Donna Donnelly, Contracts Specialist**
PersonalCare Insurance of Illinois, Inc.
2110 Fox Drive
Champaign, IL  611820

307 Amphitheater Drive
Rockford, IL  61107

This letter is to provide notice that Prometheus Laboratories Inc is cancelling the
Participating Ancillary Provider Agreement between Prometheus and PersonalCare
Insurance of Illinois, Inc.  The contract was to be effective November 1, 2006, and
Prometheus is cancelling prior to the effective date.  The contract is now null and void.

We have internal compliance policies that were not addressed in the contract; and
therefore, we cannot move forward with this contract.  If you are still interested in
contracting with Prometheus regarding our laboratory services, please contact Karl
Odquist at 858-587-4192.  We would be glad to provide you with a template of our
reference laboratory services agreement for your review.

Thank you for your immediate attention to this matter.

Sincerely,

Ron Rocca
General Manager and
Vice President of Sales

# Exhibit C



## PERSONALCARE
### A Coventry Health Care Plan

March 21, 2008

, MD

Re:  Prometheus Laboratories, Inc.

Dear Dr█████

As you know, PersonalCare contracts with numerous laboratories. Currently, Prometheus Laboratories, Inc. ("PLI") is refusing to accept our discounted rates thus not abiding by the terms of the contract. PLI is a laboratory with its home office located in San Diego, California. PersonalCare has abided by the terms of that contract; PLI has not. We have been informed on numerous occasions that PLI has billed health plan members the difference between our agreed upon contractual rate and their "billed" amount. This practice on the part of PLI is prohibited under the terms of our contract and by Illinois law.    *illegal ?*

We have tried repeatedly to work with PLI and have asked them to stop balance billing health plan members, but they have persisted in their efforts. They have even taken some members to collections over the "balance owed." We have now filed a complaint with the State of California Department of Managed Health Care on behalf of all affected health plan members, urging the State to get PLI to halt these illegal practices.

Our records reflect that you sent PLI a laboratory test for█████████████ Until PLI is willing to abide by our contract, please use other contracted laboratories for PersonalCare members. Enclosed is a list of PersonalCare contracted laboratories. We will continue to try and work with PLI as well as the State of California to resolve our differences.

Sincerely,

*Sallie Miller*

Sallie Miller
Provider Relations Director

Enclosure

PersonalCare Insurance of Illinois, Inc.

Champaign Office

2110 Fox Drive • Champaign, Illinois 61820

T: 217.366.1226 • F: 217.366.5470 • Toll-Free: 888.366.6730

www.PersonalCare.org

CHPC 1000.1



**PERSONALCARE**
*A Coventry Health Care Plan*

May 2007

## PersonalCare Participating Laboratories

| Laboratory Name | Website |
|---|---|
| Diagnostic Cytology Laboratories, Inc. | www.dcla.com |
| LabCorp (Laboratory Corporation of America) | www.labcorp.com |
| LabOne | www.labone.com |
| Myriad Genetic Laboratory | www.Myriad.com |
| NRI Laboratories, Inc. | www.nrilabs.com |
| Quest Diagnostics | www.questdiagnostics.com |
| Rabkin Dermatopathology Laboratory - Statewide | No website (800) 786-3054 |
| Terre Haute Medical Laboratory | www.thml.com |
| UniLab, Inc. | www.LowCostBloodTest.org |

In addition to the laboratories listed above, most of our participating in-network hospitals have laboratories that are participating for PersonalCare.

For PersonalCare members, it is important that you use a participating laboratory or the member WILL be financially responsible for paying a larger portion or in some circumstances, ALL of the billed lab charges.